## Huidekoper *against* Cotton.

A rule to take depositions may be entered in the court below while the cause is pending in the supreme court on a writ of error.

In an action for a malicious prosecution, one of the grand jurors who returned a bill of indictment " ignoramus," is a competent witness to prove who the prosecutor was.

Notes of testimony, upon which a warrant was grounded, cannot be read to establish probable cause for issuing it, when the witnesses are alive and within the jurisdiction of the court.

A judgment is not erroneous because the verdict on which it was rendered was delivered on Sunday.

ERROR to the common pleas of *Warren* county.

This was an action for a malicious prosecution by James Cotton against H. I. Huidekoper. Cotton had been indicted for an assault and battery with intent to kill Huidekoper, and the grand jury returned the bill " ignoramus," and this suit was instituted. The cause had been once tried before, and was removed to the supreme court by writ of error: while there pending, the plaintiff below entered a rule to take ·depositions, to be read in the event that the judgment should be reversed and a *venire de novo* awarded. The depositions were objected to on this trial, on the ground that when the rule was entered in the court below, the cause was not pending there; but the court (Shippen, president) overruled the objection. The plaintiff offered a grand juror as a witness to prove that Huidekoper was the prosecutor of the indictment; the competency of the witness was objected to on the ground of the capacity in which he received the information that he was called to testify to; but this objection was also overruled, and the witness was sworn. The defendant offered in evidence the notes of the testimony of witnesses, taken by the magistrate who issued the warrant, to establish probable cause for the prosecution; this evidence was objected to as incompetent, the witnesses themselves being alive and within the jurisdiction of the court; this offer of evidence was rejected. The trial closed on Saturday, the jury rendered their verdict on Sunday morning, and the judgment was entered on Monday. This was assigned for error, and also the rejection and receiving the evidence as stated.

*Galbreath,* for plaintiff in error.
*Thompson,* for defendant in error.

The opinion of the Court was delivered by
HUSTON, J.—This was an action for a malicious prosecution. An

[Huidekoper v. Cotton.]

indictment had been presented against Cotton, on a charge of shooting at Huidekoper with a rifle with intent to kill him, and wounding his horse. The grand jury returned the bill "ignoramus," and Cotton instituted this suit. It was removed to this court once before, and a *venire de novo* awarded. During the time that the record was in this court, the plaintiff below entered in the common pleas a rule to take depositions, &c., to be used if the cause should be tried again on a *venire*, and took sundry depositions in pursuance of this : these depositions were objected to, because the rule was entered in the common pleas, while the record was in the supreme court. They were admitted, and exception taken. This bill of exceptions ought not to have been 'taken in the court below, nor have been brought here. The act of the 26th of March 1827 provides expressly for entering a rule and taking depositions in such a case. It is a good and convenient law. The action remains stated on the docket, and it was wise to provide that a person should have the power of perpetuating his testimony, while his cause was pending any where.

The depositions of the foreman and some of the grand jurors were offered to prove who was the prosecutor. The court admitted the testimony, rejecting such parts as stated the opinion of the witnesses. This was objected to, as being contrary to the oath of the grand juror and the policy of the law. The court overruled the objection, and another bill of exceptions was sealed. That part of the grand juror's oath, " the commonwealth's counsel, your fellows', and your, own, you shall keep secret," has been the subject of much observation and some misconstruction. It was framed in another country, and during a state of society different from that in which we live. A powerful and disorderly baron once came with his armed followers and took the judges off the bench in York, and kept them prisoners in his castle some weeks. In such times it might have been dangerous to a witness to have it known that he gave evidence before a grand jury against such a chieftain. Bills of indictment are sent to a grand jury, and presentments are made by them, before the culprit is arrested, and they are not permitted to give information of this, so that the accused may escape. It is not allowed that they should disclose who agreed to find the bill, and who did not agree. I shall not undertake to specify every matter which is embraced by these words. That part of the oath, as well as the whole of the proceeding, was intended to punish the guilty, without risk to those who, in performance of their duty, took a part in the proceeding; but it never was intended to punish the innocent or obstruct the course of justice. So far from being the policy of our law that a prosecutor, however groundless the charge, should escape; directly the reverse is provided for : by an old act of assembly it is enacted, that "no person shall be obliged to answer to any indictment or presentment unless the prosecutor's name be indorsed ;" and so far is our law from forbidding the grand jury from disclosing the name of the prosecutor, that it is provided by the act of the 8th of December 1804, that in all

III.——H

[Huidekoper v. Cotton.]

indictments, cases of felony excepted, the grand jury, when they return a bill " ignoramus," shall decide whether the county or the prosecutor shall pay the costs; and if they return that the prosecutor is to pay the costs, they shall name who is the prosecutor. It would seem then impossible to decide that to be against the oath of a grand juror, or against the policy of the law, which is, by enactment of the legislature, a part of the duty of the grand jury.

In England also a grand juror may be examined to prove who was the prosecutor. *Selwyn's N. P. (by Wheaton)* 815.

At the time when Cotton was first arrested and bound over, several witnesses were examined in addition to the oath of Mr Huidekoper. Notes of their testimony were taken, and of the cross-examination: it was proved that these notes were taken as the testimony was given, and the defendant's counsel offered to read them, to show probable cause; they were objected to, overruled, and exception taken.

The witnesses were in full life and within reach of the process of the court, and had not been subpœnaed to attend.

It is then no more nor less than examining a man at one court, and at a subsequent hearing calling, not the same man and swearing him, but calling a by-stander to prove what was before sworn. But there was another and fatal objection: the paper offered did not purport to be the words of any witness; it consisted of abbreviations and short abstracts of sentences; prepositions, adverbs and conjunctions generally omitted; impersonal verbs much used; verbs without any nominative, and nouns without verbs; in short, though correct as notes, from which the writer might refresh his memory and give a correct statement of what the witness said, yet, taken as written, it was uncertain, and much of it totally unintelligible *to a stranger*. *The notes of testimony* is an expression which is applied to very different matters. In our ordinary trials, the witness, after uttering a sentence, is silent until it is written down, and then proceeds with another sentence. What is thus written, is often the very words of the witness, and is more like a deposition than notes; though it is called the notes of the testimony, and when written by careful counsel, and properly sworn to, has been received to prove what was said by a witness who is dead or gone out of the jurisdiction of the court. What was offered in the present case was a different matter—an abstract of each sentence; and though perfectly intelligible to the witness and to him who wrote it at the time, it was not so to any other person. These notes might have enabled the writer, by recurring to them, to have given a pretty full and correct account of what the witness swore; but the writer was not offered as a witness for this purpose, and the notes were rightly rejected.

The next bill of exceptions was to the overruling some notes offered for another purpose—and no error in it.

The last error assigned does not in fact appear on the record; but the judge has stated the fact, that it may receive the consideration of this court. The jury was sworn on Thursday; the trial continued

[Huidekoper v. Cotton.]

until Saturday after dark, when the jury retired to make up their verdict. They did not agree for some time; and the verdict was given in about five o'clock on Sunday morning. The judgment on that verdict was rendered on Monday. It is contended that all is erroneous or void because the verdict was given in on Sunday.

I can say for myself, and I believe for the whole court, that we should be very unwilling to sanction any violation of the Sabbath. After the charge of the court, a jury cannot separate. The objection goes to a great length: if it is unlawful or sinful to deliver the verdict to the prothonotary, verbally, after Sunday has commenced, I must suppose it would be equally unlawful to write and seal it up to be delivered on Monday; nay, to deliberate upon and discuss it after Sunday had commenced. In some districts the practice of sealing up a verdict and delivering it in court is general, in some it is not usual, and is not known to the common law. Now whether it would be less sinful, in fact and in its consequences, to keep a jury from Saturday night until Monday morning locked up without food; or to permit them to give a verdict, go home and attend public worship, I leave to casuists to discuss. However strange it may seem, it is certainly true, that Christians, for some centuries, kept their courts open on Sundays; and this in opposition to their heathen neighbours, who abstained from holding court on days appropriated to certain religious ceremonies in honour of their deities, and who also had certain unlucky days—*fasti et infasti.* At length decrees of councils of the church, and of the emperors and governments, forbade holding courts on Sunday; but they went further, and included many other days —Lent and other fasts of the Catholic church, Christmas, Easter, and several days before and after. These were many of them established by the civil authority in England, but were never part of the law in this state. Every denomination of Christians in our country has its own regulations for its own members; but we have no general ecclesiastical law, and our courts have no power in such matters, except what is expressly given by legislative enactments. Our legislature in 1705 enacted, that "no person, on the first day of the week, shall serve or execute, or cause to be served or executed, any writ, precept, warrant, order, judgment or decree, except in cases of treason, felony or breach of the peace;" and declares such service void, and the person serving it liable to an action, as though he had acted without writ, warrant, order, judgment or decree.

In point of fact, I remember cases in the common pleas and in the circuit courts, between 1798 and 1809, in which the jury charged and sent to deliberate on Saturday, did not agree until after twelve o'clock on Saturday night, and in some instances until late in the forenoon of Sunday. In some of those cases writs of error were taken, and in some appeal: so far as I know, the present objection has not been taken in our courts before.

I have heard of courts sitting and counsel arguing causes on Sunday. I never saw it, and I would not do it.

[Huidekoper v. Cotton.]

But as I said, we have no power in the matter but what the legislature have given us: we may have our opinion of what religion permits or forbids; as judges we can only say, that is void which the legislature has declared void. No law forbids the receiving of a, verdict as this was received, and usage sanctions it.

Judgment affirmed.